Ruger, Ch. J.
 

 Thomas McGovern, the plaintiff’s intestate, a laborer in the employ of the defendant, was killed while engaged in cleaning out a bin containing grain. The defendant operated a railroad and owned a grain elevator at •Ogdensburg, and was engaged in the business of transporting •grain and other freight upon its railroad. The elevator contained one hundred and forty-four bins, wooden structures, about fifty feet in height and twelve or fourteen feet square, terminating at the bottom in a sort of double hopper, from which spouts, several feet in length and about six inches square, ran to places provided for its reception when grain was being loaded for transportation. When the spout was opqn the grain, in its natural condition, would, by its own gravity, empty the bin and discharge itself through the spout. Sometimes, however, the grain became heated, in which case it would adhere and become banked up in greater or less quantities on the sides of the bin. The various bins had an aggregate capacity of upwards of six hundred thousand bushels, and each bin must therefore have been capable of containing about four thousand bushels. In the side of the hopper, at the bottom of each bin, a trap door eleven inches by thirteen had been constructed to allow workmen to enter for the purpose of cleaning out the bin. These doors swung on hinges and opened inward and upward. Of course, when the bin was full they could not be opened, but when the grain ran out, so that the doors were relieved from the pressure, they could be ■opened and then rested upon the inclined sides of the bottom of the bin, secured only by their own weight. The bins could also be entered from the top, where a man was usually stationed with lanterns, ladders and other appliances to examine and determine the condition of the grain in the bins, whenever a knowledge of that fact was deemed necessary.1 Two men, of whom the plaintiff’s intestate was one, were employed to clean out the bins after the grain had been discharged, or when, for any reason, it had ceased to run through the spouts provided for its return. These men alternated in this work, and when bin No. 101, in which the accident happened, “ went to shoveling,” as it was called, or ceased to discharge grain, it was the turn of McGovern to enter and clean it out.
 

 It does not appear that there were any arrangements for keeping an account of the quantity of grain discharged from the bins, or that remaining in the respective bins as they were being discharged, and those facts could be determined only by actual inspection. Obviously, this could only be discovered with accuracy by an inspection from the top, since the bottom of the bin was dark and the vision obscured by dirt and other substances remain
 

 n
 
 *418
 
 ing in it, and was inaccessible when any considerable quantity of undetached grain remained in the bin. It was originally intended that the bin should be entered and cleaned from the top, but, for some reason not appearing, the defendant, at some time, substituted the trap doors and that mode of entrance for the former mode. The plaintiff’s intestate had been employed in the business by the defendant for a period of about thirteen years, and, so far as appears, no accident had happened to him during that period. He knew that grain was liable to become heated and sticky, and while in that condition would adhere to the sides of the bin to some extent No rules for the inspection of the bins-had been adopted by the defendant, and the workmen employed to clean them were left to work according to their own devices, except as they were specially ordered from time to time to enter the bins from the bottom, by the defendant. On the day in question the plaintiff’s intestate was called upon to enter the bin and clean
 
 it
 
 out. When he arrived on the ground he found
 
 the
 
 trap door open and a ladder, running from the floor to the door, placed there by the superintendent. That officer had already examined the bin with a pole from the trap door and had, apparently, been unable to discover the location of the grain supposed to be in the bin. Fackerell, an associate of the deceased, Rad, by the superintendent’s order, also, been in the bin at the bottom and had loosened and discharged all the grain he could reach with a pole from that point. The lower part of the elevator contained no-grain, and it was obvious that if any remained therein it adhered to the sides of the bin at some place between the top and the-point which could be reached from the bottom; but where it was could not be discovered from the bottom. It could have been easily and safely discovered from the top by letting down a lantern or descending a ladder until the grain was reached.
 

 These means were not, however, employed and McGovern was,, either impliedly or expressly, directed to enter the bin through the trap door and clean it out This he proceeded to do, and shortly after entering it Fackerell, his associate, was directed to assist him. Fackerell also went into the bin with a pole and after remaining a few minutes and finding
 
 that
 
 the grain was probably piled up on the side of the bin, beyond his reach, told McGovern that they had better get at it from the top; that it was not safe to do so from the bottom. Fackerell then started to get out, and as-he was passing through the trap door was ordered by the superintendent to call McGovern out Fackerell repeated this order to-McGovern and as he reached the floor he saw McGovern with his legs partly out of the door, in the act of attempting to descend the ladder. Soon thereafter the legs disappeared and tRe door became closed. It was then evident to the superintendent, and the other by-standers, that the grain had fallen and closed the door and imprisoned McGovern. The superintendent and workmen then went to the upper story and entered the bin from the top, where they found a large quantity of grain in the bottom of the bin. After shovelling some time they came to McGovern’s dead body-in the bottom of the bin near the spout.
 

 __
 

 
 *419
 
 The danger to persons in the bottom of a bin arising from the presence of large quantities of grain therein, which had become attached to its sides by heat and was liable to break away and fall from a slight jar, or other cause, was so obvious that it must have been apparent to those who constructed the trap door, as well as to all who were engaged in conducting the business. The precaution .adopted by the master for inspection from the top of the bin •showed that he was aware of the danger, and that there might be occasions when it was impossible or dangerous to inspect from the bottom.
 

 Upon this case the plaintiff was non-suited at the circuit upon ¡the ground that the proof did not show negligence on the part of ¡the defendant, and that the deceased was guilty of contributory negligence. This judgment was affirmed at general term, and from that affirmance an appeal is taken to this court
 

 The case is not entirely free from doubt, but we are of the opinion that the questions involved are those of fact which required a submission to the jury. The measure of the duty which rests upon those who are prosecuting a dangerous business, which is intrinsically hazardous to human life, is not made so definite .and clear by the authorities that a person can always readily determine from the facts of a given case whether injuries occur from the omission of some duty imposed upon the master, or from the risks which are incident to the business and assumed by the servant Employments which are carried on by the aid •of machinery and the use of mechanical power, or the movement of large bodies, are generally either dangerous in themselves or .are made so by the carelessness of those who are engaged in carrying them on. It may, we think, be laid down as a general rule that the dangers connected with such a business, which are unavoidable after the exercise by the master of proper care and precaution in guarding against them, are risks incident to the employment and are assumed by those who consent to accept employment under such circumstances. But those dangers which are known and can be mitigated or avoided by the exercise of reasonable care and precaution on the part of those carrying on the business, and injuries from which happen through neglect to exercise such care, are not incident to the business and the master is generally liable for damages occuring therefrom. Eor instance, if the servant puts himself in the way of dangerous machinery, with knowledge of its character, or places himself in the way •of bodies moving in their accustomed orbit with irresistible power .and is thereby injured, it will generally be regarded as the result of his own carelessness; but if he is engaged in a business which may be safely carried on according to the degree of care and caution used in prosecuting it, but by the omission of such care may become hazardous to human life, it is the duty of those so carrying on such business to adopt all reasonable precaution to avoid ■the occurrence of such danger, by adopting the modes of conducting the business to the avoidance of the ascertainable dangers accompanying its exercise. In other words, it is the duty of the master, having control of the times, places and conditions under;
 
 *420
 
 which the servant is required to labor, to guard him against probable danger in all cases in which that may be done by the exercise of reasonable caution. The master is required to furnish the servant adequate and suitable tools and implements for his use ; a safe and proper place in which to prosecute his work, and when they are needed, the employment of skillful and competent workmen to direct his labor and the performance of his duties.
 
 Pantzar
 
 v.
 
 Tilly Foster Co.,
 
 99 N. Y., 376.
 

 It has been held that reasonable care on the part of a servant in the performance of his work presupposes the performance by the master of his duty to do all that reasonably lies within his power' to protect the servant while so engaged.
 
 Bulkley
 
 v.
 
 Port Henry Iron Co.,
 
 17 N. Y. State Rep., 436; 117 N. Y., 645; 27 N. Y., State Rep., 978 ;
 
 Booth
 
 v.
 
 B. & A. R. R. Co.,
 
 73 N. Y., 40;
 
 Pantzar
 
 v.
 
 Tilly Foster Min. Co.,
 
 99 N. Y., 376. When directing the performance of work by the servant in a place which may become dangerous, and such danger may be foreseen and guarded against by the exercise of reasonable care and prudence on the part of the master, it is his duty to exercise such care and adopt such precautions as will protect the servant from avoidable danger. This is the master’s duty, and however he may choose to exercise it, whether through the supervision of a superintendent, or some lower grade of employment, it still continues his duty, and not until he shows that it has been properly performed can he claim exemption from liability for injuries occasioned by its non-performance.
 
 Laning
 
 v. N.
 
 Y. C. R. R. Co.,
 
 49 N. Y., 521-532;
 
 Corcoran
 
 v.
 
 Holbrook,
 
 59 id., 517.
 

 Can it be said, as matter of law, in this case, that the master had performed the duties to its servants which the rules referred to imposed upon it? The defendant was a corporation, and necessarily performed all of its duties through agents. It had a superintendent, who it appears had entire control over the elevator in question, and the men employed in it. This superintendent was present at the scene of the accident, and knew the place where, and the conditions under which the servant was required to-work. He had reason to know that the grain had not been entirely discharged from the bin, and had examined it for the-purpose of discovering its location and condition, and had failed to do so. He also knew that the grain was heated, and liable, in that condition, to stick together and adhere to the sides of the bin, and it was for the purpose of detaching this grain that he sent the plaintiff’s intestate into the bin. When detached, he knew the grain must, under the operation of natural laws, fall into the bottom of the bin and jeopardize the lives of those who might then be there. He opened the trap door, placed the ladder in position and sent for the plaintiff’s intestate to enter the bin, and practically required him to enter through the trap door. He made no effort to cause the bin to be examined from the top, with a view of ascertaining the quantity of grain remaining therein or its location. Before the accident happened he recognized the danger and ordered McGovern out of the bin, but too late to avoid the catastrophe. We
 
 *421
 
 have said the superintendent was aware of these facts and performed the acts referred to. That officer stood in the place of the corporation with respect to its servants, and what he knew the corporation knew, and what he said and did was the speech and act of the corporation.
 

 We think, under the circumstances, it was the province of the jury to determine whether the defendant discharged the duty which it owed to its servants. They might have found that the master was negligent in performing the duty of making proper inspection before ordering its servants to enter a place which was obviously dangerous. The place in which the master required the servant to work was clearly unsafe, and it was a question for the jury to determine whether the master had adopted all reasonable precaution to shield him from the danger he was exposed to in the place assigned to him for labor before^ requiring him to occupy that place.
 

 We think the question might also have been left to the jury to determine whether the omission to make rules and regulations prescribing the conditions under which servants should be required or permitted to enter the bins at the bottom was or was not a neglect of such reasonable care and precaution as a master engaged in such business was bound to take under the circumstances of this case.
 
 Abel
 
 v.
 
 D. & H. C. Co.,
 
 103 N. Y., 583; 4 N. Y. State Rep., 269;
 
 Bulkley
 
 v.
 
 Port Henry Iron Co.,
 
 117 N.Y., 645 ; 27 N. Y. State Rep., 978. We are, therefore, of the opinion that the case ought to have been left to the jury on the question of the defendant’s negligence.
 

 The question as to whether the plaintiff's intestate was guilty of contributory negligence, is, perhaps, one of more doubt than the other; but we are of the opinion that that also was a question for the jury. The deceased was a mere laborer, employed solely to shovel grain, and having no duty of inspection or supervision to perform, he worked when and wherever he was directed to do so by his superiors. On the occasion in question he was sent for by the superintendent to enter the bin from the bottom. He found the trap door open, the ladder in position and his superior officer awaiting his action. If he had ventured, under such circumstances, to refuse to enter the bin, or delayed work until an inspection had been made from the top, it would obviously have been considered an impertinence by his employers. The master had provided the place for and prescribed the mode of doing the work, and it is quite unlikely that any suggestions from the servant would at that time have been heeded by his superiors. He knew nothing about the condition of the grain in the bin, except that as it was expelled from the spout earlier in the day, it appeared to have been heated. It is suggested that when he was informed the bin had gone to “shovelling ” he remarked that that couldn’t be so, as he had been in the bin the day before. We do not see what this remark indicated. Certainly nothing in regard to a knowledge of the condition of' the bin on a subsequent day. How or where he entered the bin the day before did not appear, and whatever he might then have discovered would not affect the
 
 *422
 
 condition of the bin the next day after three or four car loads of grain had been removed from it. The question whether there was danger in entering the bin depended altogether upon the quantity of grain remaining in it. If it was a small amount adhering to the sides, needing only to be scraped off, it would be comparatively safe. If, however, it was a large quantity sufficient when loosened to fill up the bottom of the bin, it would be unquestionably dangerous. He did not know, and could not know with the means of knowledge, how much grain there was left in the bin. He had a right to assume that the superintendent did know and had not ordered him to enter the bin when it was manifestly dangerous to do so.
 

 We are therefore of the opinion that there was evidence in the case from which the jury might have found that the plaintiff’s intestate was free from negligence.
 
 Bulkley
 
 v.
 
 Port Henry Iron Co., supra; Pantzar
 
 v.
 
 Tilly Foster Mining Co., supra.
 

 The judgments of the courts below should be reversed and a new trial ordered, with costs to abide the event.
 

 All concur, except Andrews, J., not voting, and Peokham, J., dissenting.