BAETZ, Appellant, vs. VALENTINE-CLARK COMPANY, Respondent.

*January 31—February 18, 1913.*

*Master and servant: Unsafe working place and appliances: Assumption of risk: Duty to warn: Obvious danger.*

Plaintiff, a teamster who had had eight or nine years' experience in the woods, drawing and skidding saw logs, was working with a team and chain dislodging, rolling down, and hauling away cedar telegraph poles from a pile about sixteen feet high. Under the direction of defendant's superintendent he had hooked the chain around the butts of two poles about six feet above the ground, for the purpose of dislodging them and throwing down the pile. He was using a shorter chain and consequently had to stand nearer to the poles than usual. As the team pulled the poles from the pile, one of them was struck by other falling poles and thrown against him, causing injuries. *Held,* that the danger was inherent in the work and was so plain and obvious to any person of ordinary intelligence that plaintiff assumed the risk and defendant owed to him no duty to warn him thereof.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Affirmed.*

The defendant is a foreign corporation engaged in dealing in and handling cedar poles and posts in its yard at Green Bay. The plaintiff is a laborer employed by defendant, and brings this action charging that he had no experience in the particular work required of him or work of a similar nature and was ignorant of the dangers incident thereunto and that defendant negligently failed to instruct or warn him of the danger incident to such work, also failed to furnish him a safe place in which to work or reasonably safe appliances with which to work. This work consisted of dislodging with a team and chain and rolling down and hauling away long cedar poles from a pile about sixteen feet high. The work was dangerous in that the poles were of different sizes, some of them crooked and liable to be thrown out of the ordinary direction in which they were rolled by their own movement

or by other poles striking them and throwing them into the space within which plaintiff was required to work. On October 25, 1910, while the plaintiff was performing the said work with due care on his part under the immediate direction and control of defendant's superintendent and in accordance with the instructions of the latter, in consequence of the negligence aforesaid plaintiff was struck by one or more poles dislodged from the pile and thrown against him, causing injuries, to his damage, etc.

A special verdict found that the poles which injured the plaintiff when he hitched onto them were bound in the face of the pile and about six feet above the ground; that the danger of injury to the plaintiff from pulling the pile down in the manner in which it was being done was not apparent to a man of his age and experience in the exercise of ordinary care for his own safety, but that a man of ordinary intelligence and prudence in the position of defendant's superintendent ought to have seen and appreciated the danger to which the plaintiff was exposed and to have anticipated that the plaintiff would not see and appreciate such danger; that the proximate cause of the injury to plaintiff was defendant's failure to warn him of such danger; and that there was no want of ordinary care on the part of the plaintiff which contributed to his injury. The court set aside this verdict because unsupported by evidence and gave judgment for defendant. And this is the error complained of.

For the appellant there was a brief by *Cady, Strehlow & Jaseph,* and oral argument by *Samuel H. Cady.*

For the respondent there was a brief by *Greene, Fairchild, North, Parker & McGillan,* and oral argument by *H. O. Fairchild.*

TIMLIN, J. The foregoing outline may be supplemented by a few details from the undisputed evidence. The poles in question were the ordinary large telegraph poles, about thirty-five feet long and twelve to fourteen inches in diameter at the larger end. A pile of these lay across skids on the ground,

the pile and skids extending north and south and the length of the poles extending east and west. After plaintiff had taken the lower poles which were loose on the skids, it became necessary to tumble down the pile, which was fifteen or sixteen feet high. The superintendent ordered plaintiff to hook onto two poles, indicating them, which were in the pile, the ends somewhat protruding and six feet above the ground. The plaintiff threw his chain around the butts indicated and hooked it so that there was about a foot between the evener and the poles. He had to stand on another projecting butt to reach up for the purpose of fastening his chain on the two poles in question. After having fastened it he descended and took hold of the reins. The team started up and pulled on the chain, but did not move the poles, which were fast in the pile. He pulled the horses back and tried again and failed. The superintendent told him to "gee" the team off to start the poles and when the poles broke away to swing the team back or "haw." Plaintiff did so, the evener twitched around and flew up, and just then the pole struck him in the hip. This pull had loosened the poles, and other poles rolled down from the pile. It must be borne in mind that except for the swinging to the right and left, the "gee" and "haw" mentioned by the witness, he was pulling these poles in the direction of their length; and that the other poles rolled down the side of the pile onto the skids but not upon or toward the plaintiff, but over and upon the smaller end of the poles to which the horses were attached. One of the latter was a crooked pole, and plaintiff's theory is that in the rolling down of the piled poles, which was the thing attempted to be done, one or more struck the end of this crooked pole, swung the butt end to which the team was hitched around, striking the plaintiff and causing the damage.

Counsel for respondent advances a somewhat different and quite plausible theory, but we are to take the evidence most favorable to the appellant with its favoring inferences, be-

cause the jury might have based their verdict upon appellant's theory had they been permitted to decide the case. Between the end of the poles to which the whiffletrees and the evener were attached and the evener there was about eight inches of chain, not more than a foot, and of course if these poles were six feet from the ground as found by the jury, the evener, the whiffletrees, and traces were elevated considerably above the rumps of the horses while the team was pulling the poles out, and would remain so until the poles were pulled out so far that the weight pulled out, with the weight of the whiffletrees and the pull, would overbalance the remainder of the poles, when the end to which the team was hitched would drop down and the other end stick up. The plaintiff while doing this "was sort of behind the nigh horse, facing toward the horses." This means that he was behind and a little to the left side of the left horse, with his back toward the pile of poles or partly toward the pile of poles and almost under the upraised whiffletrees and evener and within a foot or two of the pile of poles. We need not say he was engaged in a hazardous piece of work and in a position of danger, for that is apparent. He had pulled these poles out eight or ten feet from the pile at the time he was struck. He had been using a longer chain that day, but it had broken before making the pull in question. The plaintiff had worked about eight or nine years teaming in the woods, drawing and skidding saw logs, had been handling horses about fifteen years, but had not theretofore handled cedar poles to any extent. Testimony of men experienced in breaking rollways and in breaking down piles of cedar poles was then offered, and it was shown that the last mentioned timbers were, especially when long and crooked, more apt to strike in falling and rebound and flop over than ordinary saw logs, because the latter are heavier, shorter, usually straight, and have their bark on. There is a greater spring and resiliency in peeled dry cedar poles than there is in other timbers, and the cedar poles in

falling will often strike one another and bound or swing around. The defendant's superintendent was working with plaintiff in handling these poles, rolling them down from the pile and in pulling down the pile.

It seems to us, within the rule of *Rahles v. J. Thompson & Sons Mfg. Co.* 137 Wis. 506, 118 N. W. 350, 119 N. W. 289; *Yezick v. Chicago B. Co.* 138 Wis. 342, 120 N. W. 247; *Brotzki v. Wis. G. Co.* 142 Wis. 380, 125 N. W. 916, and other like cases, this danger was not only necessarily inherent in the work in which the plaintiff was engaged, but was also so obvious and apparent that it was plain to any person of ordinary intelligence. To require one to say to an intelligent man engaged in trying to tumble down a pile of long cedar poles with a team hitched in the manner described that the falling poles may strike one of those to which his team is hitched and swing it around, seems like an idle ceremony of words. Long poles, crooked poles, and light poles fall, bound, and swing in a manner somewhat different from shorter, straighter, and heavier logs, but every workman and every person who possesses a modicum of common sense knows that. The real cause of the unfortunate accident in question was using this extremely short chain to pull down the pile of poles by dislodging two poles up about six feet from the ground. This short chain compelled the plaintiff to either stand at one side of his team, where he could not handle them so well, or to stand where he did at the side of and so near to the poles to which his team was hitched that the falling pile of poles threw one or both of the poles to which his chain was fastened against him. This risk he intelligently and affirmatively assumed. The fall of the pile was the result he was trying to bring about and did bring about. He expected that the pile would fall, and he knew that no very strict rules would guide the poles in their descent. He also knew that the pile would collapse, if at all, before he had completely removed therefrom the two poles to which his horses were

hitched, and that it must fall over and upon or with these two poles.

The notion that there is something unusual, extraordinary, or peculiar in the fall of a pile of cedar poles is well presented, but its effect is exaggerated. We cannot overlook the fact that any adult intelligent person knows that when he tumbles down a pile of any kind the units of which the pile is composed will fall in disorder and with great irregularity, varying in velocity, direction, and effect somewhat according to the height of the pile and the nature of such units, but in all cases where such units have considerable weight with danger to those standing near the falling pile. There is no duty to warn an intelligent adult employee of such obvious consequence of the very act which he is knowingly engaged in performing. The judgment of the circuit court must be affirmed.

*By the Court.*—It is so ordered.